```
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
 2

 3      ------------------------------------------------------------
                                   )
 4      My Pillow, Inc.,           )   File No. 21CV1015
                                   )        (PJS/DTS)
 5              Plaintiff,         )
                                   )
 6      vs.                        )   Minneapolis, Minnesota
                                   )   June 18, 2021
 7      US Dominion, Inc.; Dominion)   9:00 A.M.
        Voting Systems, Inc.; and  )
 8      Dominion Voting Systems     )
        Corporation,               )
 9                                 )
                Defendants.        )
10      ------------------------------------------------------------

11          BEFORE THE HONORABLE MAGISTRATE JUDGE DAVID T. SCHULTZ
                    UNITED STATES DISTRICT COURT
12                         (MOTION HEARING)

13      APPEARANCES
         For the Plaintiff:        Parker Daniels Kibort LLC
14                                 ANDREW D. PARKER, ESQ.
                                   123 North Third Street
15                                 Suite 888
                                   Minneapolis, MN 55401

16       For the Defendants:       Faegre Drinker Biddle & Reath
                                   LLP
17                                 JOHN W. URSU, ESQ.
                                   90 South Seventh Street
18                                 2200 Wells Fargo Center
                                   Minneapolis, MN 55402
19

20       Court Reporter:          KRISTINE MOUSSEAU, CRR-RPR
                                   300 South Fourth Street
21                                 Box 1005
                                   Minneapolis, MN 55415

22

23

24          Proceedings recorded by mechanical stenography;
        transcript produced by computer.
25
```

1                              **9:00 A.M.**

2

3                          **(In open court.)**

4              THE COURT:  Good morning, everyone.  Be seated.

5              I'm going to let you know in advance we had a

6      request from CNN to listen in on this.  The Court's policy

7      is if it's an in-court hearing, they're more than welcome

8      to show up, but typically we don't make arrangements for

9      them to dial in.

10             Since we have one person who requested it, we can

11     actually accommodate that, so if they call in I'm going to

12     let them call in and listen in, but that may happen, who

13     knows, sometime after the hearing has started, so just be

14     aware of that so you know.

15             We are on the record in the matter of My Pillow,

16     Inc., d/b/a MyPillow versus US Dominion, Inc., et al, Civil

17     Case Number 21-1015.

18             Counsel for My Pillow, if you would note your

19     appearance for the record.

20             MR. PARKER:  Andrew Parker representing My

21     Pillow.

22             THE COURT:  Good morning, Mr. Parker.  Counsel

23     for the defendants, if you would note your appearance?

24             MR. URSU:  John Ursu from Faegre Drinker Biddle &

25     Reath, and I represent Dominion.

1          THE COURT:  Good morning, Mr. Ursu.  All right.

2    I have read everything.

3          Mr. Parker, you have the floor.  If you want to

4    come on up to the podium, I would appreciate it.

5          MR. URSU:  I think we are the movant.

6          THE COURT:  I'm sorry.  I think that is right,

7    Mr. Ursu.  You have the floor.  So let me ask you before

8    you begin.  There is obviously a case that is related to

9    this out of the District of the District of Columbia.

10          MR. URSU:  Yes.

11          THE COURT:  And as I understand your motion, you

12    would like the Court to stay these proceedings or stay at

13    least the defendants' answer or responsive pleading pending

14    a motion to transfer or dismiss that's been filed by

15    Mr. Parker's client in the District of the District of

16    Columbia.

17          MR. URSU:  That's correct.

18          THE COURT:  So tell me.  What's the primary

19    prejudice that would be avoided by staying this matter?

20          MR. URSU:  Waste and judicial efficiency.  The

21    briefing and the argument and the order that arises out of

22    the DC action will almost certainly be informative for the

23    Court and for the parties and will need to be addressed

24    with briefing in this matter.

25          The briefing in this case, if we were to proceed

1    ahead of time, would likely be superseded.  There would

2    likely need to be supplemental briefing, and the Court may

3    face motions to reconsider if it rules before the DC Court.

4              THE COURT:  And rules on what specifically?

5              MR. URSU:  Rules on a number of issues.  My

6    Pillow had moved to transfer and in their motion --

7              THE COURT:  This case out to the district or the

8    district's case out here, rather.

9              MR. URSU:  Yes, has moved to transfer Dominion's

10   case against my My Pillow to the District of Minnesota, and

11   their motion to transfer and their motion to dismiss were

12   filed on exactly the same day as their complaint in this

13   case.

14              This case was filed shortly before the motion to

15   dismiss was filed in DC.  Here's what they said in

16   Washington, DC.  "The District of Columbia has little

17   specific interest in this dispute.  This is especially true

18   because there is a related action pending between these

19   parties in the United States District Court for the

20   District of Minnesota.  Judicial efficiency would be

21   promoted by transferring this case to Minnesota."

22              It's undisputed between these parties that

23   consideration of these cases together would promote

24   judicial efficiency.

25              THE COURT:  That may or may not be true.  It

1    doesn't strike me as untrue.  I'm obviously not deciding

2    that, but here is what confuses me about this motion.  You

3    want to delay the time to respond to the complaint, right?

4    I mean that's basically the motion.

5            We're staying -- it's not like you have a motion

6    here pending to transfer this case or to dismiss this case

7    at this time.

8            MR. URSU:  Not at this time, and to be clear,

9    we're expressly preserving all our defenses and will assert

10   them later.  Our belief is that the DC Court handling these

11   cases in an order where the DC Court rules first staying

12   this action until they do will help the parties and the

13   Court decide for a number of reasons, including that

14   Dominion will likely file a motion to transfer to

15   Washington DC and the federal court there.

16           If the Court in DC were to rule that there is no

17   action in Washington, DC, or the Court in DC were to rule

18   that the case should be transferred here, we would in

19   effect be stepping on that.

20                   **(Telephone rings.)**

21           THE COURT:  All right.  Hang on, Mr. Ursu.

22           Good morning.  Is anyone on the Court's telephone

23   line?

24           THE CALLER:  Yes.  I am a member of the press.

25   I'm calling to listen.

1              THE COURT:  You are from CNN; is that correct?

2              THE CALLER:  Yes.  That's correct.

3              THE COURT:  Okay.  I need you to do two things.

4    We have just begun the argument on the motion to stay.  I

5    need you to mute your line, and obviously you may not

6    interrupt the proceedings.  I'm sure you know that.

7              Okay?

8              THE CALLER:  Absolutely.  Thank you so much.

9              THE COURT:  Okay.  Mr. Ursu, I'm sorry for the

10   interruption.  I did want to accommodate this request, but

11   if you can pick up where you left off.

12             MR. URSU:  Certainly.  The doctrines that deal

13   with federal courts and parallel proceedings are largely

14   prudential.  They are born of experience, and they are born

15   of wisdom because there is, you know, the fear of course is

16   that always that there will be parallel actions and a race

17   to judgment.

18             This Court does generally move to trial slightly

19   more quicker than the District of DC, and because these

20   actions are the same, courts generally defer to the case

21   that was filed first, and deferring to the case that was

22   filed first in this instance would be promoted by staying

23   the case.

24             This happens all the time.  It happens almost

25   always by stipulation where, you know, the center of

1    gravity of the case is still in dispute and usually

2    deference to the first filed case makes a lot of sense.  I

3    will contend that it makes even more sense here because of

4    how entwined these matters are, and may I just show the

5    Court how that is so?

6           I was surprised to see in My Pillow's motion that

7    it says on page 4, "This case is not overlapping with

8    Dominion's DC lawsuit," and the next sentence after that

9    contends that Dominion executed a campaign of publicity,

10   threats, pressure and intimidation that resulted in damage

11   to My Pillow.

12          That's what they put in their motion papers here.

13   Here's what it actually says in the complaint, and in the

14   complaint it's part and parcel of their 1983 claim.  It's

15   the first claim in their complaint, one that they subtitled

16   "lawfare," and they omitted one word which is an important

17   one.

18          It is paragraph 93 of the complaint, and it says

19   here contends that defendants intentionally, were

20   intentionally seeking through threats, intimidation and

21   litigation.  That's not all.

22          If you look at -- and of course, you know,

23   Mr. Parker has a duty of candor to the Court.  He is

24   leaving that out for a reason, and he's leaving it out

25   because he has no answer to it.

1          THE COURT:  Well, you know, I can understand

2     there may be a semantic distinction to be made in the

3     sense, okay, this is not overlapping.  This litigation is

4     in response to the litigation in the District of Columbia.

5          It doesn't seem that there is any way that one

6     can say they are unrelated or unconnected, obviously,

7     because as I understand the theory of this case is, in part

8     at least, you sued us in the District of Columbia, and that

9     in and of itself is tortious and wrongful, and we are

10    seeking damages because you filed a lawsuit in DC.

11         MR. URSU:  Yes.  In most cases where there is a

12    compulsory counterclaim that is instead filed in a

13    different forum because there is a forum dispute, it's a

14    declaratory judgment action.  We see it all the time.  We

15    used to see it in patent cases all the time.

16         This is a declaratory judgment action in effect,

17    you know, with -- on steroids.  It's saying in effect that

18    the defenses that they have to Dominion's lawsuit in DC,

19    the defamation lawsuit in DC, give rise to causes of

20    action, and among those causes of action is the due

21    process.  It's the fifth count in the complaint, and it's

22    called out specifically.

23         The DC action, they note that on February 22nd,

24    2021, defendants filed a lawsuit against plaintiff in the

25    District of DC asserting meritless claims, and that's

1    paragraph 123.  If the premise of this lawsuit, and it

2    certainly is one of them, is that the claims in DC are

3    meritless, it is hard to fathom how this Court could

4    address those issues while the DC Court does the same.

5              THE COURT:  Well, but so that's a different issue

6    at least than I thought we were dealing with.  Is it your

7    suggestion that this case in its entirety should be stayed

8    until the entire case in DC is resolved?  Is that really

9    what you're suggesting?

10             MR. URSU:  No.

11             THE COURT:  Okay.

12             MR. URSU:  No.  We will bring a range of motions,

13   as you can imagine, when it's time to present our defenses.

14   Those may include a motion under the first filed doctrine

15   which does permit a stay as one of the options, but that's

16   not our motion here today.

17             Our motion here today is to, for this Court and

18   the litigants and the cause of justice that all of those

19   will be furthered by having the information that arises out

20   of the DC Court's ruling on the pending motions and the

21   motions that will be argued on Thursday.

22             THE COURT:  Well, let me push on that a little

23   bit.  First of all, looking at it from the perspective of

24   what happens in DC, let's say the DC Court denies transfer.

25   Okay?  Boom.  That means that case is not coming here.

1          MR. URSU:  Yes.

2          THE COURT:  Which means absent some other action

3    being taken here, this case will proceed on its parallel

4    track, number one.  If the DC Court transfers that case

5    here, this case gets, for lack of a better word, gets

6    folded in here, but Dominion would still be responsible for

7    responding to the affirmative claims that are made here,

8    and that response, it seems to me, is a stand-alone from

9    the fact, if it is a fact, if it happens, that the DC case

10   is transferred here.

11         So that's number one, I think.  Number two is, in

12   the alternative, the DC Court denies the motion to dismiss

13   as well.  So that's already covered in my view from the

14   transfer issue, or the DC Court dismissed the lawsuit in

15   DC, and we're still here with a lawsuit that the defendant

16   has to respond to.

17         So looking at it sort of from east to west, if

18   you will, I don't see that anything that the DC Court does

19   saves resources if the defendants' response here is

20   delayed.

21         MR. URSU:  If defendants' response here is

22   delayed until after the DC Court rules, and that's what we

23   have proposed, a stay of, where the parties check in every

24   120 days and that we then respond at least 30 days after

25   the DC Court rules.  In that circumstance, that is, that is

1    what Dominion is moving for here, and so staying the entire

2    action, you know, indefinitely, which is what Mr. Parker

3    says in his papers, is not what we're doing.

4              THE COURT:  But I guess what I'm getting at is,

5    the substance of whatever the defendants' response is to

6    this lawsuit doesn't really change depending upon what the

7    DC Court does because what you've got in front of you is a

8    lawsuit.

9              You have to formulate whatever response you're

10   going to formulate to this lawsuit, but it isn't, the

11   response, it doesn't seem to me, substantively depends on

12   what the DC Court does.  That's the thing that I'm

13   struggling with in your motion.

14             MR. URSU:  Certainly, and I have three responses

15   to it.  I think your comment began with the question of

16   what, you know, what resources would be squandered, what

17   briefing would have to be potentially be done.  Surely

18   that's true on Dominion's likely motion to transfer.

19             Surely if we have to brief that before the DC

20   Court decides, that would be time and energy that would be

21   wasted in a way that I think matters to courts when they

22   resolve this.

23             My Pillow has also moved on personal jurisdiction

24   grounds.  As you can imagine, Dominion will likely do the

25   same.  It is, it is, it is hard to fathom that we would not

1    make an argument that there could not be specific

2    jurisdiction in Minnesota for an action that was filed in

3    DC, so we might well make those types of arguments.

4            It won't matter whether the DC action remains

5    there or not, whether the personal jurisdiction motion is

6    granted or not.  If My Pillow's personal jurisdiction

7    motion were granted, all of that argument would all be

8    wasted, and the Court, if it rules before the DC Court,

9    might rule on a faulty premise, that there is a DC action

10   that is persistent.

11           So this is why the first filed doctrine,

12   abstention doctrines and other court developed devices

13   generally defer to the first filed action where there is

14   substantial overlap and that a mechanism for doing that in

15   the first instance is a stay.

16           Lastly I will say, a problem with advocacy is I

17   think demonstrating the totality of things.  You can

18   explain bits and pieces and parts.  It is worth reading My

19   Pillow's motion to dismiss and motion to transfer side by

20   side with the complaint in this case.

21           In many, many, many instances, and I think in sum

22   and substance, these arguments are moved here to the

23   District of Minnesota as affirmative claims, and the

24   concern with courts always with parallel actions is

25   potentially inconsistent rulings and, you know, most

1    predominantly a race to judgment where there could be

2    potentially preclusive issues in one matter.

3              THE COURT:  You know, that to my ear, that

4    argument, certainly I'm -- that makes sense to me, but it

5    kind of begs the question.  The response to that is, one

6    way or another, if you're right, these cases should be

7    together, whether they're here or they're in DC, but that's

8    not really what we're accomplishing with a stay at this

9    point.

10             In fact I'm kind of curious why you don't embrace

11   the race to the courthouse, as it were.  Why wouldn't

12   Dominion file a motion to transfer, or what have you, this

13   action to the district while that motion is pending out

14   there.

15             MR. URSU:  That motion is being argued next

16   Thursday.

17             THE COURT:  Right.

18             MR. URSU:  Our having dueling sets of motions in

19   different courts is I think the definition of judicial

20   inefficiency.  That's what in effect My Pillow is trying to

21   accomplish with its motion to transfer here.  There are

22   always strategy questions around, you know, what's the best

23   approach and otherwise, and that's true with, you know,

24   retaliatory cases like this one as well.

25             The overriding purpose of the way courts handle

1    cases that could have been brought as a counterclaim in the

2    original action is generally to allow to defer to the first

3    filed action and that first court.  We believe that that

4    mechanism, doing that will accomplish what you describe, so

5    that's why this is here.

6              In our, you know, Dominion believes that the case

7    is going to remain in DC, and Dominion believes that the

8    Court will rule in its favor and believes that --

9    gamesmanship like saying that there is a related action

10   pending between these parties in the United States Court

11   for the District of Minnesota and then not saying it was

12   filed the very same day, that's the type of thing that I

13   think courts generally frown on.

14             And they do it for the good reason that, you

15   know, this Court has COVID backlog.  Most courts have a

16   COVID backlog.  Dealing with motions that either will never

17   be heard or will be superseded or need to be reconsidered,

18   it makes no -- it poses all the risks that these doctrines

19   are designed to avoid.

20             And that is the hardship that we have articulated

21   in our papers, and I will note that Mr. Parker makes a lot

22   of the hardship factor, but he never addresses it in the

23   sense that his only hardship is that My Pillow would like

24   to go fast.

25             And if the fact is that plaintiff in this case

1   wants to go fast, that's just the kind of race to the

2   courthouse that we're trying to avoid, and I think in most

3   instances, federal courts do avoid and in most instances

4   it's stipulated where there is some uncertainty as to where

5   the case will ultimately land.

6        That happens with every MDL.  That happens

7   frequently in this court where they start bringing cases

8   together.

9        THE COURT:  I suppose there is no chance that the

10  parties to these cases would stipulate that they should be

11  together in a particular venue.  I'm assuming that's not a

12  possibility here.

13       MR. URSU:  Certainly no one has authority from

14  their client to do so, and nor do I think that's necessary

15  because I think the -- it is hard to believe that the

16  courts will not ultimately want to treat them together.  We

17  do not, by the way, I mean most significantly, there is not

18  personal jurisdiction over Dominion in Minnesota as our

19  likely argument will be.

20       We will likely argue that there is no personal

21  jurisdiction here when we assert our defenses.

22       THE COURT:  Do you have an informed estimate,

23  assuming the motion in DC is argued on, what, the 24th?

24       MR. URSU:  Yes.

25       THE COURT:  Do you have an informed estimate as

1    to when that ruling would likely come down?

2         MR. URSU:  We asked for 120 days because our

3    belief is that will be sufficient for the DC Court to

4    resolve this matter.  The DC Court is treating this case

5    with dispatch.  It is, My Pillow's reply brief is due today

6    in the District of DC action.

7         Four days later the hearing will be held, and it

8    will be held in a range of cases that involve these same

9    issues, and so having that range of cases considered, we

10   cannot imagine that that will not be useful to the Court.

11        And it is hard to believe that the Court would

12   not face the kinds of motion to reconsider or motions

13   under, you know, or different types of things based on how

14   the DC Court rules.  The DC Court rules in most

15   circumstances will not compel a result here, but it will be

16   highly useful, for instance, as to the scope and scale of

17   their defenses, as to the merit of their defenses, whether

18   they exist and as they allege in this case whether there is

19   merit to Dominion's claim in DC.

20        Those are all live issues here, all of which

21   would have to be briefed in front of this Court without the

22   knowledge of how the DC Court rules.

23        THE COURT:  Something you just said made me a

24   little nervous that let's just suppose the DC Court says we

25   agree with My Pillow, we're going to transfer that case to

1    the District of Minnesota.  In all likelihood whether the

2    cases are consolidated, they are likely to be assigned at

3    least to the same district judge and the same magistrate

4    judge.

5         Let's suppose that that all happens, or in fact

6    that they're consolidated with the current case.  I think I

7    just heard you say there is nothing in that ruling

8    transferring the DC case here that would preclude Dominion

9    from then bringing a motion here to transfer the whole

10   bucket somewhere else, maybe DC, somewhere else.

11        Am I hearing that accurately?

12        MR. URSU:  If the -- if those circumstances were

13   true that the DC Court transferred the DC action here, I

14   believe your question presumes that it will do so first

15   before Dominion files its motions, and that is exactly what

16   we're trying to avoid here.

17        If we were to brief, for instance, that this

18   matter should end up in Washington, DC, and what you said

19   just happens, remember that, you know, Dominion will likely

20   assert personal jurisdiction defenses and will say, I am

21   confident, that it won't, that this venue is inappropriate

22   and that this case might well end up somewhere else.

23        And so where we move to transfer is relevant.

24   What the DC Court does is relevant to it, so I believe that

25   that would be an important factor in the briefing and an

1    important factor in what we ultimately choose to do and an

2    important factor in making sure that the briefing is not

3    superseded and has to be redone.

4            THE COURT:  Okay.  Thank you, Mr. Ursu.  Anything

5    further?

6            MR. URSU:  Only that I think the right, as I have

7    read this to my mind, the right way to consider their

8    complaint is the same way that the Court considers

9    declaratory judgment actions that are filed elsewhere.

10   This is part of a forum dispute and avoiding the dual track

11   parallel actions where districts that are under different

12   circuit law, for instance, have different routes to appeal,

13   those are what the prudential doctrines that we're relying

14   on are designed to avoid.

15           Thank you.

16           THE COURT:  All right.  Thank you.

17           Mr. Parker.  Let me start by asking you sort of

18   the opposite side of the same coin, which is let's suppose

19   the Court were to grant the stay that's been requested,

20   other than the prejudice that's inherent in the notion

21   that, you know, justice delayed is justice denied, I mean,

22   obviously staying something is inherently to some level

23   prejudicial.

24           Beyond that, what's the prejudice that your

25   client would suffer if this matter were stayed pending the

1    resolution of the motions out in DC?

2         MR. PARKER:  Well, I don't think the Court should

3    understate the foundational elements of delay.  It's in

4    fact constitutional violation arguably, and if the Court

5    reviews -- this is very interesting.  I just looked at this

6    two days ago after I prepared my papers.

7         I looked closer at the decision, full decision by

8    the Eighth Circuit on motions to stay in *Paula Jones versus*

9    *William Jefferson Clinton*, and the President of the United

10   States, sitting President of the United States making all

11   the arguments about the harm that it would cause if that

12   matter was stayed, and it was a Section 1983 matter, just

13   like this one is in that regard in terms of claims.

14        And the Court stated in that case, it is

15   incorrect -- and this is the Eighth Circuit, Bowman writing

16   the opinion.  The dissent was by Ross, and the concurring

17   opinion, the deciding vote, was by Beam, and Beam wrote a

18   very interesting opinion.  "It is incorrect in my view,"

19   and I'm quoting, "for Mr. Clinton and his amicus," and

20   there were 50 amicus attorneys, the who is who of

21   constitutional attorneys weighing in on this motion to

22   stay.

23        The damage to Clinton, the presidency, et cetera,

24   was so great, that was the gravity of it.  Judge Beam said,

25   "It is incorrect in my view for Mr. Clinton and his amicus

1    to assert that the delay is of no consequence to Ms. Jones.

2    Aside from the adage that justice delayed is justice

3    denied, Ms. Jones faces real dangers of loss of evidence

4    through the unforeseeable calamities or inevitable with the

5    passage of time.  Only rarely does life proceed in such a

6    foreseeable fashion."

7         This case, I would argue, is worse because in

8    this case we have ongoing litigation.  We have ongoing

9    media coverage and attacks.  This lawsuit is about My

10   Pillow being damaged and destroyed by a company, Dominion,

11   and we can't sit around and wait while the damage continues

12   and the destruction and the coverage continues regarding My

13   Pillow.

14        This is a claim by a company that has been

15   attacked, and it has been articulated in our complaint.

16   Now, defendants get up and they want to re-cast our

17   complaint, and that can be in a motion.  If they want to

18   bring a motion and claim this is really a compulsory

19   counterclaim or this is really a declaratory judgment, let

20   them bring that motion.

21        I'm not going to stand here and argue that motion

22   because it's not before the Court.  This is a motion to

23   stay, and there is zero basis, and certainly the hardship

24   comes nowhere near what it is to delay for My Pillow.

25        THE COURT:  Let me stop you for a second.  First

1    of all, a comment about *Jones v. Clinton*.  At least one

2    distinction between that case and the portion of Judge

3    Beam's opinion you quote that is different is, in that

4    case, the stay was stay the litigation until President

5    Clinton is in longer in office.

6         Whereas in this case, at least what I'm hearing

7    Mr. Ursu say is, stay this case or more accurately I think

8    stay our response to the complaint until the DC Court

9    rules, which our best guess is will be no more than 120

10   days, so that is a distinction.  I don't mean to downplay

11   that delay is prejudicial.  It is inherently prejudicial in

12   a sense.

13        But what I'm trying to find out is, assuming

14   that's right, that we're dealing with a limited duration,

15   is there a specific harm that is consequential here?

16        MR. PARKER:  You know, I don't want to reiterate

17   *Jones v. Clinton* and the principles in *Jones v. Clinton* and

18   the principles about the fact that this is a request for

19   extraordinary relief, that this is the exception and not

20   the rule.  The presumption is no stay.

21        The requesting party must make out specific

22   hardship, and it needs to be identified.  We do not have

23   to, and I would say the request is not for 120 days.  The

24   request is to report to the Court in 120 days, because this

25   decision -- and I've seen them in federal courts because of

1    the busy nature of federal courts, motions to dismiss can

2    be decided a year down the road, and in the *Clinton* case I

3    think he had a year, year and a half left in his

4    presidency.

5         I mean, who knows how long this will go on, but

6    this attempt to claim that we cannot bring the motions that

7    we're going to bring in response because of what's going on

8    in DC is fallacious.  It just doesn't have foundation to

9    it, and I think the Court has put his finger on it through

10   questioning fully, you know, understanding the issue that,

11   well, bring those motions.  If you have motions to bring,

12   bring them.

13        We disagree that this is a substantially

14   overlapping case.  It is not, and we at the right time will

15   argue why it isn't.  That is a case about defamation and

16   whether the pleading was sufficiently pled for actual

17   malice.  That's at the core of that case.

18        That issue does not play into what Dominion did

19   in its campaign against My Pillow, to damage My Pillow, a

20   Minnesota company with 700 employees, several of whom are

21   owners of that company, and they're being greatly damaged.

22   They don't want a delay for a year or even six months.

23        And it should be, you know, noted, and I don't

24   want to accuse counsel of gamesmanship or lack of candor.

25   I wouldn't do that, but when the call was made to us to

1    extend time for a response in this case, we said how much

2    time do you need?  They told us.  We said okay, and they

3    were given 60 full days to respond when 21 is in the rule.

4           They waited until the very end of that period

5    virtually until they brought a motion to stay.  Nothing was

6    different.  They could have brought the motion to stay

7    immediately.  We could have dispatched with it, and we

8    could be moving on with the case, which My Pillow has a

9    right, a constitutional right, to do.

10          And that's why the presumption is, you do not

11   stay cases unless there is a very good reason to do it, and

12   there just isn't in this case.  The one other point that,

13   you know, I really wanted to hit home was, the Court very

14   adroitly described what might happen depending on the

15   rulings in DC.

16          And you're absolutely correct that if the Court

17   in DC rules one way, the case comes here, and we have the

18   motions that could be brought right now here anyway.  If

19   the Court rules the other way, we have two separate cases

20   going on, and they have to respond to the complaint anyway.

21          There is no value to avoid what they claim is

22   harm by staying this action, and that's why when called and

23   asked will you stay, I know how working with opposing

24   counsel, and I do all the time, I said -- I didn't say no,

25   we're not going to -- what I said was, put in your

1    response, let's all take a look at it and let's come up

2    with an orderly reschedule.

3           No, that was rejected without discussion and

4    responded to with a motion, and, you know, that's --

5    listen.  Again, I'm not going to claim gamesmanship by my

6    friend Mr. Ursu, who is a very good lawyer, and I would

7    never do that, and I wouldn't suggest that he ever had a

8    lack of candor with the Court in the way he described all

9    of this rolling out.

10          But those are the facts, and I think that is the

11   orderly manner in which to coordinate the Court and the

12   parties' steps forward in the case.

13          THE COURT:  Hang on, Mr. Parker.  So let me ask

14   what might be viewed as a perhaps less than scholarly

15   question or less than legalistic question, but isn't --

16   let's say the stay is denied, and US Dominion decides well,

17   we're going to bring a motion to transfer this case.  Let's

18   say that's what they decide to do or they bring some other

19   motion.

20          As a practical matter, isn't the first thing

21   that's going to happen is Judge Schiltz is going to pick up

22   the phone and talk to the judge in DC, and frankly, the

23   judges are going to manage the issue of judicial resources,

24   not that they will collaborate on an outcome, but that they

25   will make sure that they don't waste everybody's time or

1     issue conflicting results, as a practical matter.

2              Do you see that as happening?

3              MR. PARKER:  Well, I want to say first that that

4     is an issue only if these two cases are viewed as one in

5     the same, and they are not one in the same.  These two

6     cases could continue one in DC, one in Minnesota, fully

7     separate, going forward because the claims are virtually,

8     not entirely, but virtually, you know, different.

9              And they -- on the one hand you have Section 1983

10    claims based upon a campaign by a company against another

11    company to destroy that company as a governmental actor

12    taking that action and the claims that flow from that.

13             On the other hand, you have, you know, defamation

14    allegations.  Those are two different -- they're the same

15    parties, but those are two different lawsuits, and so the

16    foundational presumption I challenge.  I know that that's

17    what the defendants want this to be believed.

18             Certainly the cases are related because they're

19    the same parties.

20             THE COURT:  Well, and a little bit more than the

21    same parties.  Isn't part of your theory of this case a

22    reaction to the fact of the litigation in DC?

23             MR. PARKER:  It is one piece of it, but it is not

24    the piece of it, which is why it was listed -- in fact --

25    if there were no campaign and just a lawsuit, that's one

1  thing, but the media blitzkrieg that was launched by

2  Dominion and the cease and desist letters and the

3  threatening letters that were sent out to witnesses, people

4  who had given sworn statements, received letters that they

5  cannot say anything about Dominion and if they do, they are

6  going to get sued.

7      Some of these people never even said anything

8  about Dominion.  They were simply witnesses who put into

9  evidence, volunteer workers, who put into evidence what

10  they witnessed at polling cites, and they received letters,

11  and so this sort of threat and intimidation and the impact

12  causing My Pillow to lose numerous large customers, big box

13  customers is, you know, that case is not the same case as

14  what's out in DC.

15      And we're going to be foreclosed from going

16  forward as a plaintiff to the courts, to the federal

17  courts, and the door is shut, or if it's not shut, it's

18  shut for a while.  That is, that is not fair, and the

19  Eighth Circuit has found that sort of determination is not

20  fair unless there is a very, very good reason, you know, a

21  reason beyond being the President of the United States and

22  being a sitting President because that wasn't good enough

23  in that case.

24      So I don't think that the defendants have shown

25  what is required for a stay.  If they want to argue all

1    these other points about all the imponderables that might

2    happen in the future, if, if, if, let them bring a motion

3    to stay once those things arise.  Let them respond so we

4    see what we're dealing with, and which is what I had

5    suggested and would have been a more orderly course here.

6              THE COURT:  Okay.  Thank you, Mr. Parker.

7              Mr. Ursu, I will give you the last word.  Go

8    ahead.

9              MR. URSU:  Thank you.  If the standard were, for

10   a stay, was that the harm had to be greater than the harm

11   to the Presidency of the United States, no stay would ever

12   be issued, and stays are issued all the time.

13             What you have described, the informal conferences

14   that might or might not happen between Judge Nickels and

15   Judge Schiltz here in Minnesota, that's the substance of

16   our motion, and the Court would do that, I think as you

17   said, to preserve judicial resources.  You know, the harm

18   to Dominion is party resources.  They have to brief things

19   that ultimately will never, you know, will never be at

20   issue in this case.

21             Here's what Mr. Parker said in his brief in this

22   motion:  "The central issue in the motion to dismiss

23   Dominion's DC action is whether Dominion's defamation

24   claims are barred by the First Amendment."

25             That's what he said in his papers is the core,

 1    and that is the claim that he's bringing here.  It is a --

 2              THE COURT:  A claim not the claim.

 3              MR. URSU:  That is a claim, along with abuse of

 4    process.  It is hard to imagine a more extraordinary case

 5    for relief than asking this Court to avoid opining on the

 6    propriety of an action that is happening in another

 7    district.  Absent some sort of anti suit injunction or the

 8    like, that does not happen, and it does not happen because

 9    of the prudential doctrines that avoid it.

10              The informal conference that you described

11    between those judges, that's based on mutual respect.

12    That's based on ultimately deciding what makes sense.

13    These rules are not mechanical.  No one says that they are.

14    These are not, this is not a summary judgment motion or

15    anything else.

16              This is really about what makes sense for the

17    orderly progression of law, and that is why we brought this

18    motion so that we can have the same, you know, avoid the

19    same kind of waste that would not make sense for the Court.

20    The Court, you know, right as we were filing a motion in

21    this case Mike Lindell, the owner of MyPillow, filed

22    another case in this district here.

23              Surely those cases will need some sort of joint

24    handling and joint management.  I imagine that that's why

25    the District Court judges decided they should go to Judge

 1    Schiltz here.

 2              Plainly, My Pillow argued in DC that joint

 3    handling of this case with the DC case would also create

 4    efficiencies.  So I think the efficiencies are, I mean,

 5    they're not undisputed.  I think they are plain.  They are

 6    judicial efficiencies, and ultimately under Rule 1 of the

 7    Federal Rules of Civil Procedure they should be party

 8    efficiencies, too.

 9              THE COURT:  Okay.  Very well.  Thank you,

10    Mr. Ursu.

11              All right.  The matter is submitted.  We will

12    endeavor to get a ruling out very quickly.  Okay?  All

13    right.  With that, I am going to stay here for a second.

14    We're in recess.  You're free to go.  All right.

15              And, Madam Reporter, assuming you can hear me, I

16    would appreciate it if you would now hang up.  Nothing is

17    going to transpire of a court process nature, and certainly

18    nothing that involves the parties.  Can you confirm that

19    you have heard this?

20              Okay.  We will assume that the reporter has

21    vacated the premises, as you were.

22              MR. URSU:  May I make a personal comment before

23    we depart, which is that I cannot tell you how pleasant it

24    is to be back in court.  It has been a long time.

25              THE COURT:  I find that to be a true statement

1    for all concerned.  It is good to be back in court.  I'm

2    with you.

3              You feel the same way, don't you, Mr. Parker?

4              MR. PARKER:  Always a pleasure to be with you,

5    Your Honor.

6              THE COURT:  Okay.  All right.

7              **(Court was adjourned.)**

8                        *         *         *

9              I, Kristine Mousseau, certify that the foregoing

10   is a correct transcript from the record of proceedings in

11   the above-entitled matter.

12

13

14

15   Certified by:  s/  *Kristine Mousseau, CRR-RPR*
                      Kristine Mousseau, CRR-RPR
16

17

18

19

20

21

22

23

24

25